```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          -against-<br><br>ALBERT RODRIGUEZ,<br>                    Defendant. | 88 CR 642 (LAP)<br><br>ORDER |

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Defendant Alberto Rodriguez's motion for compassionate release. (Dkt. no. 265.) The Government opposed (dkt. no. 268), and Defendant replied (dkt. no. 274). For the reasons set forth below, the motion is denied.

**Background**

In September 1988, in connection with an investigation of a cocaine trafficking organization located in upper Manhattan, the DEA worked with two confidential sources and identified two supply-level drug dealers – Rafael Romero and the Defendant. (See PSR ¶¶ 5-7.) Romero and the Defendant had agreed to sell the sources two kilograms of cocaine at a price of $17,500 per kilogram. (Id. ¶ 5.) On the evening of September 6, DEA agents and the sources met and attempted to execute the purchase. After meeting with Romero in the vicinity of West 156th Street and Amsterdam Avenue and discussing the planned purchase, Romero introduced the sources to the Defendant, who told the sources

1

the transaction would occur in his apartment. (Id. ¶¶ 7-9.) The sources accompanied Romero and the Defendant to that apartment, after which the sources were searched by the drug dealers, who were suspicious of the sources. (Id. ¶ 10.) Inside the apartment, from where the sources were standing in the living room, they observed another unidentified man at a table with plastic bags and a scale in a back room, and the sources discussed the planned transaction with Romero while the Defendant left to acquire the cocaine, ostensibly from another apartment in the building. (Id. ¶¶ 10-11.) During the conversation, Romero explained that he had history working with the Defendant selling drugs and promised additional quantities of cocaine would be available if this deal went successfully. (Id. ¶ 11.) When the Defendant returned, he accused one of the sources of working with law enforcement, but after further discussion the situation calmed, and the deal went ahead. (Id. ¶ 12.) Romero and the Defendant spoke with the unidentified man at the table in the back room, and the Defendant returned to the living room with a kilogram of cocaine. (Id.) At that point, the sources covertly alerted DEA that the deal had been completed. (Id.)

DEA agents approached the apartment building and made their way to the third-floor landing outside Apartment 3D. (PSR ¶ 13.) As they set up outside the door to the apartment with their DEA

shields displayed, the door opened, and Romero stepped outside. (Id. ¶¶ 13-14.) Seizing the moment, the DEA agents began yelling, "Police, Policia, stop," while attempting to detain Romero. (Id.) Romero was passed to Special Agent Travers and other agents, but Romero struggled free and ran from the building, where he was later apprehended by additional agents stationed outside. (Id. ¶ 14.) Meanwhile, the Defendant, who could see and hear the Romero arrest from his position inside the apartment, tossed the kilogram of cocaine to the floor and ran down an apartment hallway as agents entered the apartment, continuing to identify themselves as law enforcement. (Id.) While three agents pursued the defendant, others – including Special Agent Travers – began conducting a protective sweep of the apartment. (Id.) Special Agent Travers, who was fourth inside the apartment, could hear the defendant struggling with other agents, who were continuing to yell that they were law enforcement. See Ex. J (Trial Tr. at 636 (testimony of Bruce Travers)). Special Agent Travers noticed a hallway closet and opened the door, seeing what he believed to be clothes hanging in the darkness. Id. After he began to close the door, he reopened it to feel inside. Id. As he did so, Special Agent Travers realized that the clothes he had seen were in fact worn by a person hiding inside the closet. Id. But it was too late. The moment that Special Agent Travers made out a human form in

3

the darkness, he saw "a bright flaming flash coming from directly in front of the form, simultaneously with [a loud bang]." Id. at 637. Special Agent Travers remained conscious, but realized that he had been seriously wounded and was bleeding profusely from his face. Id. at 637-38. As he held his hand to the right side of his face, he attempted to speak to his fellow agents but found he could not. Id. at 638. Special Agent Travers then managed to crawl behind a fellow agent until the gunfire stopped. Id. at 639.

Meanwhile, other agents observed that Santos had repositioned himself inside the closet, and, as he held his firearm with both hands extended from the door of the closet, he continued to fire over where Special Agent Travers's body had fallen. (PSR ¶¶ 15-17.) At least one agent fired his weapon at Santos, until Santos also was struck and pitched forward from his location inside the closet. (Id. ¶¶ 17-18.) Agents searched Santos and found his weapon, which was a defaced .357 "Trooper" magnum revolver with six spent shell casings in the cylinder, along with a nylon shoulder holster. (Id. ¶¶ 1, 15, 19.) Santos had fired every round in the weapon. (Id. ¶ 19.) A subsequent search of the apartment revealed additional ammunition which was capable of being fired from Santos's revolver in the kitchen of the apartment, along with drug records, scales, packaging

4

materials, and a modest additional quantity of cocaine. (Id. ¶ 23.)

All injured parties were subsequently transported to the hospital. Special Agent Travers's injuries were the most severe, and he was in critical condition. (PSR ¶ 20.) As he later explained at trial, "the bullet . . . shattered my right cheekbone, fractured my eye socket in 4 p[l]aces, fractured my nasal bone, traveled down through my mouth, shattering my upper right jaw, fracturing my lower jaw in 8 places, and exited through my neck." Ex. J at 642. As a result, Special Agent Travers lost a third of his teeth; he lost a half-inch from his tongue, which had been severed; and he was left with a hole in the roof of his mouth reaching his nasal cavity, as well as multiple metal plates and bars inserted in an effort to rebuild his facial fractures. (Id.) In addition to Special Agent Travers, Santos's volley from the closet also struck one of the DEA sources, sending a bullet into the source's left bicep below his shoulder and out from the middle of his back. (Id. ¶¶ 16, 20.) The source survived his injuries after a brief hospitalization. (Id. ¶ 20.) Santos also was hospitalized and survived. (Id. ¶ 21.)

On or about August 12, 2020 Defendant sought compassionate release from the Warden of FCI Butner. (Dkt. no. 268, Ex. G.)

On or about December 9, 2020, the Warden denied that request. (Id. at Ex. H.)

**Applicable Law**

A motion under Title 18, United States Code, Section 3582(c)(1)(A) may be made by either the BOP or a defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Id. As relevant here, under Section 3582(c), this Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute. The pertinent portion of Section 3582(c) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)  extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Id. § 3582(c)(1)(A). The Sentencing Commission policy statement relevant here is found in U.S.S.G. § 1B1.13, and it provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," id. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id. § 1B1.13(3). See Dillon v. United States, 560 U.S. 817, 827 (2010); see also 28 U.S.C. § 994(t) (delegating authority to the Sentencing Commission to define "extraordinary and compelling reason").[1] The Second Circuit Court of Appeals also has held that, following the passage of the First Step Act of 2018 ("FSA"), a district court has discretion to determine whether grounds advanced in a motion for compassionate release constitute "extraordinary and

---

[1] The Application Notes to that policy statement go on to describe specific circumstances under which "extraordinary and compelling reasons exist." U.S.S.G. § 1B1.13, app. n.1. For example, the first application note relates to the defendant's own medical condition, and may apply where a defendant is: (1) suffering from a serious physical or medical condition; (2) suffering from a serious functional or cognitive impairment; or (3) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. Id. Additionally, the second application note applies when a defendant is at least 65 years old, is seriously physically or mentally deteriorating, and has served a prescribed amount of prison time. Id., app. n.1(B).

7

compelling reasons." United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020).[2]

In all cases, the defendant bears the burden of proving "extraordinary and compelling reasons" exist justifying early release. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."). And the "existence of 'extraordinary and compelling reasons' for a reduction does not mean that a district court must release the defendant." United States v. Madoff, 465 F. Supp. 3d 343, 349 (S.D.N.Y. 2020) (quoting United States v. Ebbers, 432 F. Supp. 3d 421, 429 (S.D.N.Y. 2020)) (emphasis in original). Rather, whether "extraordinary and compelling reasons" exist is only "[t]he threshold question," United States v. Daugerdas, No. 09 Cr. 581, 2020 WL 2097653, at *2 (S.D.N.Y. May 1, 2020), and "[t]his Court must also 'consider[] the factors set forth in section 3553(a).'" Id. at *4. Those traditional factors include, among other things, the following:

  (1)  the nature and circumstances of the offense and the
       history and characteristics of the defendant; [and]

---

[2] Pursuant to 28 U.S.C. § 994(t), however, "[r]ehabilitation of [a] defendant alone shall not be considered an extraordinary and compelling reason" permitting early release. Id.; accord Brooker, 976 F.3d at 237-38 (describing Section 994(t) as a "statutory limit on what a court may consider to be extraordinary and compelling").

8

> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct; [and]
> >
> > (C) to protect the public from further crimes of the defendant . . . .

18 U.S.C. § 3553(a). Consideration of the relevant Section 3553(a) factors requires an assessment of whether those factors "outweigh [any] 'extraordinary and compelling reasons' warranting compassionate release . . . [and] whether compassionate release would undermine the goals of the original sentence." Ebbers, 432 F. Supp. 3d at 431; United States v. Lisi, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *5-6 (S.D.N.Y. Feb. 24, 2020) (finding "extraordinary and compelling reasons" warranting the defendant's release, but nevertheless denying motion for compassionate release because Section 3553(a) factors "weigh[ed] heavily against [a] reduction of [the defendant's] sentence").

**Discussion**

Defendant's motion is based largely on his concerns about COVID-19 and several health conditions that he suffers. None of these factors is sufficient to constitute "extraordinary and compelling reason for release."

First, Defendant argues that his age may warrant early termination of his life sentence. (See e.g., dkt. no. 265 at 3.) Although unvaccinated older adults may be at greater risk of severe illness with COVID-19,[3] Defendant is sixty-nine, is fully vaccinated, and recently tested negative for COVID-19. (Dkt. no. 268 at 7.) Thus, in light of his vaccination status and negative test, Defendant cannot establish extraordinary and compelling reasons for his release. See, e.g., United States v. Diaz, Case No. 19 Cr. 65 (JMF), 2021 WL 2018217, at *1 (S.D.N.Y. May 20, 2021) (finding the defendant's "argument — which depends largely, if not entirely, on the risks relating to COVID19 — falls short because he has been fully vaccinated with the Moderna vaccine"); United States v. Brown, Case No. 16 Cr. 436 (KMW), 2021 WL 1154207, at *3 (S.D.N.Y. Mar. 26, 2021) ("Because Brown will soon be fully vaccinated, any risk that he may become severely ill from COVID-19 will be reduced significantly.")

Second, Defendant claims that he has "memory lapse issues and language barriers." (Dkt. no. 265 at 3.) Neither issue, however, seems to have prevented Defendant from living his daily life (see dkt. no. 268, Ex. H) or obtaining whatever medical

---

[3] See CDC, "Older Adults," available at https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/older-adults.html (last visited Aug. 2, 2021) ("Older unvaccinated adults are more likely to be hospitalized or die from COVID-19").

10

care he requires within the BOP. In short, the Defendant is not "experiencing a serious deterioration in physical or mental health because of the aging process" that warrants release. U.S.S.G. § 1B1.13(2). While there is no precise definition, Section 1B1.13 typically "applies to senior-citizen defendants who have already spent over ten years in prison and whose physical and cognitive deterioration <u>has impaired basic human functions</u> without regard to whether their conditions, other than aging, are terminal." Ebbers, 432 F. Supp. 3d at 429 (emphasis added); cf. United States v. Bellamy, No. 15-165(8) (JRT/LIB), 2019 U.S. Dist. LEXIS 124219, at *7-8 (D. Minn. July 25, 2019) (granting compassionate release where defendant "needs assistance getting to the bathroom, taking a shower, getting dressed, making phone calls, using the computer, and almost every single basic thing that he needs to do to complete a day . . . [and] is confined to a wheelchair or his bed for more than 50% of the time he is awake" (internal quotation marks and citations omitted)). The Defendant's medical records indicate that he suffers no such impediments. Rather, as the BOP found, the Defendant is "independent [in] [his] activities of daily living," his "current medical conditions remain under control," and he is "receiving appropriate medical care and treatment." (Dkt. no. 268, Ex. H.)

11

Finally, Defendant notes that he has previously suffered cancer and underwent strenuous treatment. According to his medical records, the Defendant was diagnosed with Stage III colon cancer, for which he underwent surgery and chemotherapy. Those same records indicate, however, that he has been in remission with no reoccurrence of the disease for approximately three years.[4] The extent and success of that treatment belies any suggestion that the BOP is unable or unwilling effectively to manage the Defendant's health conditions, even when it may require complicated or extensive treatment. Accordingly, Defendant's age and health concerns do not demonstrate extraordinary and compelling reasons justifying his release.

Even if these ailments as Mr. Rodriguez describes them could constitute "extraordinary and compelling circumstances warranting release" under § 3582(c), that only answers '[t]he threshold question." United States v. Daugerdas, 2020 WL

---

[4] The Defendant indicates that he "also may have prostate cancer." (Dkt. no. 265 at 4.) While his medical records do not appear to reflect a final diagnosis, they do indicate that he will be tested in connection with that condition. Even should such a diagnosis be confirmed, release is not warranted both because BOP previously successfully treated the Defendant for colon cancer and because there is no indication that the Defendant will get better treatment – or indeed, any treatment – should he be released. As noted above, the Defendant also is fully vaccinated and, "[a]s a result, he 'now has significant protection against serious illness or death should he contract COVID-19.'" Diaz, 2021 WL 2018217 at *1 (quoting United States v. Singh, No. 4:15-CR-00028-11, 2021 WL 928740, at *3 (M.D. Pa. Mar. 11, 2021)).

2097653, at *2 (S.D.N.Y. May 1, 2020) (Pauley, J.)  The Court must also consider the factors set out in § 3553(a).  These factors weight heavily against release.

First, the nature and circumstances underlying Defendant's convictions counsel against release.  This Defendant violently fought with the arresting agents, who constantly announced themselves as police, and was responsible with others for a heinous attempt to execute Special Agent Bruce W. Travers by shooting him in the face.  The impact of Defendant's conduct on Special Agent Travers' life has been horrific, and it is only by sheer luck that the agent did not die on the night of Defendant's arrest.  The seriousness and wantonness of Defendant's conduct counsels against release.

Second, a life sentence is required to reflect the seriousness of Defendant's conduct, to promote respect of the law and provide just punishment for that conduct.  At Defendant's 1989 trial, Special Agent Travers described his injuries and the treatment he had received up to that point. Over the intervening years, Travers's need for medical intervention has only gradually abated. His injuries resulted in over a year-and-a-half convalescence and fourteen surgeries over the course of three years. Even after those surgeries, which included painful bone grafts and the permanent insertion of numerous metal plates, screws, bolts, and other joints into his

13

face and head, Special Agent Travers still requires prosthetic devices to maintain the shape of his face. He inserts those prostheses each morning, and removes them before sleep every night. Alongside mandatory annual check-ins with his medical team, Special Agent Travers also must endure chronic sinus infections that are, in and of themselves, inordinately dangerous; because his sinuses were effectively destroyed by the shooting and now cannot properly drain, Special Agent Travers experiences frequent infections that are difficult to treat and pose continued threats to his health. These same conditions likewise make it impossible for Special Agent Travers to breathe at night, unless he sleeps in one specific position on his side; any other position will cause him to stop breathing. Moreover, the right side of Special Agent Travers's face is numb to the touch, and his face and neck bear deep scars from the shooting, an emergency tracheotomy, and the various reconstructive surgeries that were required to repair the damage caused by the shooting.

In short, to this day Special Agent Travers bears the scars – both physical and mental – of his ordeal, and suffers daily the consequences of his brush with the Defendant and his coconspirators. Special Agent Travers did, of course, survive this confrontation, and later retired from the DEA after decades of continued – albeit limited – service. He has paid a high


14

face and head, Special Agent Travers still requires prosthetic devices to maintain the shape of his face. He inserts those prostheses each morning, and removes them before sleep every night. Alongside mandatory annual check-ins with his medical team, Special Agent Travers also must endure chronic sinus infections that are, in and of themselves, inordinately dangerous; because his sinuses were effectively destroyed by the shooting and now cannot properly drain, Special Agent Travers experiences frequent infections that are difficult to treat and pose continued threats to his health. These same conditions likewise make it impossible for Special Agent Travers to breathe at night, unless he sleeps in one specific position on his side; any other position will cause him to stop breathing. Moreover, the right side of Special Agent Travers's face is numb to the touch, and his face and neck bear deep scars from the shooting, an emergency tracheotomy, and the various reconstructive surgeries that were required to repair the damage caused by the shooting.

In short, to this day Special Agent Travers bears the scars – both physical and mental – of his ordeal, and suffers daily the consequences of his brush with the Defendant and his coconspirators. Special Agent Travers did, of course, survive this confrontation, and later retired from the DEA after decades of continued – albeit limited – service. He has paid a high

price for doing his duty to enforce the law, and his recovery does not diminish the extraordinary, lifelong hardships he has faced as a result of the shooting. Despite obligatory nods to the tremendous harm inflicted on Special Agent Travers, however, the Defendant continues to deny any responsibility for his injuries. (See ECF No. 265 at 3, 10.) Contrary to those denials, however, a jury found the Defendant and his co-conspirators guilty beyond a reasonable doubt of conduct that nearly brought about the death of a federal agent. And as Judge Ward recounted at the defendant's sentencing, there was ample evidence to support that verdict, including because:

> It is well settled that dealing in narcotics is a violent business and those who seek to enrich themselves by participating in it understand that it is a risky business and that violence is a reasonably foreseeable consequence of engaging in this business. [The defendant's] awareness of this was amply demonstrated by his challenging of the confidential informant for being a cop, for standing by and observing as his coconspirator Rafael Romero patted down the two confidential informants for weapons. [The defendant's] awareness was also demonstrated by the fact that he maintained the apartment which was used in connection with both small retail sales and larger bulk sales of drugs, an apartment equipped with a warning light system and containing a cache of ammunition."

Ex. I at 25-26. Indeed, "a box of live ammunition that could be used in the weapon which had been recovered from Santos, was recovered by agents from on top of the refrigerator in the kitchen." (PSR ¶ 23.) And in a post-arrest statement at a

hospital following the shooting, Santos told a nurse, among other things, that he was "told . . . to hide in the closet and in the event of trouble, to shoot." (Id. ¶ 21.) Based on that and other evidence, a jury long ago rejected the Defendant's attempts to avoid responsibility for the horrors visited upon Special Agent Travers, yet the Defendant still refuses to take responsibility for those actions. As such, the Defendant has hardly "show[n]" that he has "great remorse" for Special Agent Travers "by changing his life." (Dkt. no. 265 at 10.) Nor has the Defendant's term of incarceration "satisfied it's [sic] purpose to pay his debt to society and promote respect for the law."[5] (Id. at 3.)

Finally, even if the Court were satisfied that there was no need to protect the public from further crimes of this Defendant, the need for general deterrence and the need to send a strong message that conduct like the wanton attempt to murder a federal agent witnessed here will not be tolerated is required. As Judge Ward noted at sentencing, the Defendant "came within millimeters of taking a human life." (Dkt. no. 268, Ex, I at 84.) Judge Ward further explained that the

---

[5] While the Defendant's efforts to take courses in prison are laudable, they are insufficient to overcome his failure to take responsibility for his crimes. Even crediting such efforts as evidence of true rehabilitation, "[r]ehabilitation of [a] defendant alone shall not be considered an extraordinary and compelling reason" permitting early release. 28 U.S.C. § 994(t).

sentences imposed needed "to provide the special deterrence necessary with regard to individuals who engage in serious criminal acts," and that the defendants' sentences were intended "to serve as a warning, as a message to others in the increasingly escalating war on drugs." Id. at 84.

Accordingly, the § 3553(a) factors counsel against release.

**Conclusion**

For the reasons stated above, Defendant's motion for compassionate release (dkt. no. 265) is denied.

The Clerk of the Court shall mail a copy of this order to Defendant.

SO ORDERED.

Dated: New York, New York
July 7, 2022

_____
LORETTA A. PRESKA
Senior United States District Judge